

# In the Court of Criminal Appeals of Texas

No. WR-75,105-02

EX PARTE RANDALL WAYNE MAYS,

*Applicant*

On Application for Writ of Habeas Corpus
In Cause No. B-15,717
In the 392nd District Court
Henderson County

YEARY, J., filed a dissenting opinion in which KELLER, P.J., joined.

Once again in this subsequent capital post-conviction application for writ of habeas corpus, brought under Article 11.071 of the Texas Code of Criminal Procedure, the Court concludes that an applicant is intellectually disabled and grants him relief in the form of reformation of his sentence from death to life without parole. TEX. CODE CRIM. PROC.

art. 11.071. But the Court does so, once again, without addressing several very important predicate issues. I will endeavor here to describe them.

Applicant was tried and convicted of capital murder in 2008 for an offense committed in 2007. This all happened six years after the United States Supreme Court issued its opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002), which decided for the whole country that execution of a capital offender who was intellectually disabled (hereafter, "ID," *nee* mentally retarded) at the time of his offense would violate the Eighth Amendment. But Applicant did not raise ID at trial. And he did not raise it on appeal. Nor did he even raise it in his initial post-conviction application for writ of habeas corpus, filed in 2010—eight years after *Atkins* was decided. Instead, Applicant has waited to raise the issue of ID until now, in a *subsequent* post-conviction application for writ of habeas corpus filed in 2020, some twelve years after his trial and eighteen years after the Supreme Court's decision in *Atkins*.

The Court apparently concludes that Applicant has satisfied the criteria for a diagnosis of ID as set out in *the latest* manual of the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (2022), or DSM-5-TR.[1]

---

[1] The Court declares that Applicant has met "the diagnostic criteria for intellectual disability under *Atkins* and *Moore*. *Moore v. Texas*, 137 S. Ct. 1039, 1044 (2017); *Moore v. Texas*, 139 S. Ct. 666 (2019)." Majority Opinion at 5. Under both *Atkins* and the two *Moore* cases, however, intellectual disability was assessed under earlier versions of the DSM manuals—the DSM-IV-TR (2000) and the DSM-5 (2013), respectively. The criteria for discerning a diagnosis of intellectual disability have changed incrementally with each passing edition of the DSM, and it has become at least marginally less burdensome for applicants to satisfy the criteria with each successive manual.

But because Applicant did not raise this issue in his initial writ application, the Court applies the higher standard for relief announced first in *Ex parte Blue*, 230 S.W.3d 151, 162−63 (Tex. Crim. App. 2007), and finds that Applicant has satisfied that standard. Majority Opinion at 5.

Under *Blue*, an applicant can successfully raise ID for the first time in a subsequent writ application under section 5(a)(3) of Article 11.071, but only if he can demonstrate that he satisfies the diagnostic criteria for ID so clearly and convincingly that no rational factfinder would fail to find him intellectually disabled. *Blue*, 230 S.W.3d at 162; TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(3). This was designed to be an onerous standard. Blue's trial occurred before *Atkins* was decided, however, and so he could not have raised ID then. The *Blue* standard was announced in the context, then, of an applicant who could *not* have raised ID at his trial, but who could have raised it in his initial writ application, but did not do so there, and then finally raised ID for the first time in a subsequent writ application, such as the one the Court addresses today.

**First: Procedural Default?** This case is not, then, in the same procedural posture as *Blue*. Because Applicant was tried eight years after *Atkins*, unlike Blue, he *could have* raised ID at trial. And yet, this Court still has not explicitly said why an applicant in this posture should

---

In any event, the recommended findings of fact and conclusions of law proposed by the parties and adopted by the convicting court exclusively applies the diagnostic criteria from the most recent DSM-5-TR, under which it has become easier still to establish ID.

not be deemed simply to have procedurally defaulted his ID claim by failing to litigate it at trial. *See Ex parte Jean*, 667 S.W.3d 766, 766−69 (Tex. Crim. App. 2023) (Yeary, J., dissenting).[2] As in *Jean*, the Court grants relief without even addressing this threshold procedural default issue.

**Second: The Correct Diagnostic Criteria?** Perhaps it may be argued (although the Court today does *not*) that Applicant has waited so long to raise his ID claim because he could not, in any event, have satisfied the diagnostic criteria under earlier DSM manuals. But of course, that begs the question of whether the DSM manuals—that have issued since *Atkins* was decided—represent anything more than just the normative values of the psychiatric community. The argument assumes that the more recent DSM manuals also accurately capture the so-called national consensus with respect to society's tolerance of the death penalty. *See Ex parte Segundo*, 663 S.W.3d 705, 712−15 (Tex. Crim. App.

---

[2] In *Jean*, as in this case, the applicant could have raised ID at trial, but unlike in this case, the applicant in *Jean* raised ID for the first time in his *initial* post-conviction writ application. In dissent there, I advocated potentially imposing a higher burden of proof on such an applicant than the ordinary preponderance standard. 667 S.W.3d at 771. Even so, I also allowed that the heightened burden "might even be something somewhat less onerous than the *Blue* standard for subsequent writs," but I argued that it should be "at least marginally more taxing than the ordinary preponderance standard." *Id*.

Blue was tried before *Atkins* was decided, and he was therefore not in a position to raise ID until his initial writ application. Applicant could have raised ID at trial, or in his initial writ, but he did neither. Because Applicant was tried after *Atkins*, he could have raised ID at *two* points previous to this subsequent application—at trial *and* in his initial writ application. He should therefore be required *at least* to satisfy the *Blue* standard.

2022) (Yeary, J., dissenting).[3] With each successive DSM manual, though, it seems to me that the courts should be required to determine whether ID, as described by each successive, less rigorous diagnostic criteria, still corresponds to society's own so-called "evolving standards of decency" for Eighth Amendment purposes. *Id.*

**Third: Has Applicant Indeed Satisfied *Blue*?** Even assuming that (1) Applicant has not procedurally defaulted his right to relief—at least under the *Blue* standard—and that (2) his claim of ID ought properly to be measured under the diagnostic criteria adopted by the latest DSM manual, it is still not at all clear to me that Applicant is entitled to relief. At this late date, Applicant has admittedly presented substantial evidence from which a rational factfinder *could* conclude, by almost any level of confidence, that he was intellectually disabled as of the time of his offense. But the proffer of sufficient—or even substantial—evidence to prove ID does not alone satisfy the *Blue* standard.

The question is not what a factfinder *could* rationally conclude

---

[3] Indeed, the successive manuals may not even accurately reflect the consensus of the psychiatric profession *itself*, much less the consensus of society. It has recently been observed that "[e]ven seemingly small changes to the [DSM] manual ([e.g.], to symptomatology of previously included disorders) can have a substantial impact on increasing the number of people who would receive a diagnosis[,]" and thus "lead to overdiagnosis[.]" Lauren C. Davis, et al., *Undisclosed Financial Conflicts of Interest in DSM-5-TR: Cross Sectional Analysis* 384 BMJ 5 (2024), https://dx.doi.org/10.1136/bmj-2023-076902. For this Court to uncritically adopt the latest expression of the apparent consensus of the psychiatric community as to the appropriate diagnostic criteria for ID, overinclusive though that expression may be, constitutes an abdication of the Court's judicial role, as required by the United States Supreme Court, to determine the consensus of American society with respect to who may and may not be executed for a capital crime consistent with the Eighth Amendment.

from the proffered evidence, as in a legal sufficiency analysis. Rather, the question that *Blue* requires us to ask is whether *no* rational factfinder would *fail* to draw the ID conclusion in the face of the evidence. *Blue*, 230 S.W.3d at 162. And, before granting relief, the Court must conclude that the evidence is clear and convincing in this regard. *Id.* I am not convinced to that level of confidence that no rational jury would fail to find Applicant ID based upon his evidence, even under the more forgiving DSM-5-TR diagnostic criteria.

It is true that the convicting court judge, in adopting the proposed findings and conclusions of the parties, declared *herself* to be convinced by clear and convincing evidence that Applicant has demonstrated his ID.[4] But convincing the judge, even to that high level of confidence, is not the same as presenting ID evidence that is *so* clear and convincing that *no rational factfinder would fail to find ID*.[5] *Cf. Ex parte Harleston*, 431 S.W.3d 67, 91−92 (Tex. Crim. App. 2014) (Price, J., concurring) (observing that what is required by the so-called "actual innocence" standard of *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), is not whether the convicting court judge finds by clear and convincing evidence that *he* would not have convicted the applicant, but whether it

---

[4] *See* Findings of Fact and Conclusions of Law, Conclusions ## 6, 11 & 13, at 24−25 (concluding that Applicant has shown by clear and convincing evidence that he suffers from sub-average intellectual functioning, adaptive deficits, and onset of same during the developmental period).

[5] The Court says it bases its disposition not just on the convicting court's recommended findings of fact and conclusions of law, but also on its "own review[.]" Majority Opinion at 5. But the Court does not convey what it is about Applicant's evidence that would convince it, by clear and convincing evidence, that no rational jury would fail to find him to be intellectually disabled. Suffice it to say, I am not so convinced.

finds new exculpatory evidence to be *so* clear and convincing that *no reasonable juror would have convicted him*); *Ex parte Navarijo*, 433 S.W.3d 558, 573−74 (Tex. Crim. App. 2014) (Price, J., concurring) ("That the convicting court chose to believe the complaining witness's recantation in this case . . . does not necessarily compel us to answer the dispositive question—'Would no reasonable juror convict?'—in the applicant's favor."). The Court should apply the proper standard.

**Fourth: The Proper Remedy?** Finally, it remains unclear to me whether, even if Applicant has met whatever burden he should have to shoulder to prove intellectual disability, the proper disposition is for this Court to just unilaterally reform his death penalty to life without parole. The Court has still not expressly addressed the question of whether the more appropriate disposition, at least for capital cases that were tried post-*Atkins*, might be to remand the case to the convicting court to empanel a new jury to determine the issue of intellectual disability there, in the first instance. *Ex parte Lizcano*, 607 S.W.3d 339, 340−41 & n.6 (Tex. Crim. App. 2020) (Yeary, J., dissenting); *Segundo*, 663 S.W.3d at 711−12 (Yeary, J., dissenting); *Ex parte Long*, 670 S.W.3d 685, 686 (Tex. Crim. App. 2023) (Yeary, J., dissenting).

For all these reasons, yet again, I must respectfully dissent.

**FILED:**                                        March 27, 2024
**PUBLISH**